UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | | |
|---|---|---|
| EMA FINANCIAL, LLC, a Delaware Limited Liability Company, | : | Case No.: |
| | : | |
| Plaintiff, | : | |
| | : | **COMPLAINT** |
| - against - | : | |
| | : | |
| PHARMAGREEN BIOTECH INC. a Nevada Corporation, | : | |
| | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Plaintiff, EMA Financial, LLC ("EMA" or "plaintiff"), by its undersigned attorneys, for its complaint, respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.      This is an action for specific performance, a permanent injunction, breach of contract, and related relief arising as the result of defendants' conduct in connection with certain agreements to purchase securities, a related convertible note agreement, and related agreements After entering into negotiated, arms-length agreements, for which defendant Pharmagreen Biotech, Inc. ("PHBI or "defendant") received valuable consideration, Defendant breached the agreements, in numerous ways, including, *inter alia*, by:  (i) failing to honor EMA's notices of conversion,  and (ii) failing to become "Rule 144 eligible" within 6 months of the issue date. Accordingly, plaintiff seeks the relief set forth herein.

## PARTIES

2.      Plaintiff EMA Financial, LLC ("EMA" or "plaintiff") is a limited liability company duly organized under the laws of the State of Delaware and having a place of business located at 40 Wall Street, New York, New York.

3.      The members of EMA reside in New York and Delaware.

4.       For purposes of diversity, EMA is a citizen of New York and Delaware.

5.      Upon information and belief, Defendant Pharmagreen Biotech, Inc. ("PHBI or "defendant") is a corporation organized and existing under the laws of the State of Florida having its principal place of business located at 2987 Blackbear Court, Coquitlam, British Colombia.

6.      For purposes of diversity, PHBI is a citizen of Nevada and Canada.

7.      PHBI is a publicly traded company, trading under the symbol "PHBI."

8.      No member of EMA is a citizen of Nevada or Canada.

9.      There is therefore complete diversity of citizenship.

## JURISDICTION AND VENUE

10.     The Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2) in that the action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

11.     This Court has supplemental jurisdiction of Plaintiff's various state law claims pursuant to 28 U.S.C. Section 1367(a).

12.     Venue is proper in this District pursuant to 27 U.S.C. §1391(a), in that it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property which is subject to this action is situated.

13.     Additionally, in the relevant agreements, defendant consented to jurisdiction and venue in the Southern District of New York.

## FACT COMMON TO ALL CLAIMS FOR RELIEF

14.     On or about October 1, 2019 after arm's-length negotiations, PHBI executed a Securities Purchase Agreement (the "SPA") and issued a Convertible Note to EMA (the "Note")

in the principal amount of $78,000. A true and correct copy of the Note is attached hereto as

Exhibit A. A true and correct copy of the SPA is annexed as Exhibit B.

15.    The Note provides that EMA, at any time after the Issue Date of the Note, has the

right to convert all or part of the Note into shares of PHBI common stock (the "Common Stock").

Specifically, §1.1 of the Note provides in pertinent part:

> The Holder shall have the right, in its sole and absolute discretion, at any time and
> from time to time to convert all or any part of the outstanding amount due under
> this Note (such outstanding amount includes but is not limited to the principal,
> interest and/or Default Interest accrued, plus any and all other amounts owed
> pursuant to the terms of this Note) into fully paid and non-assessable shares of
> Common Stock.

Ex. A at 1.1.

16.    Likewise, 1.4(a) of the Note provides that: "Subject to Section 1.1, this Note may

be converted by the Holder in whole or in part at any time and from time to time after the Issue

Date, by submitting to the Borrower or Borrower's transfer agent a Notice of Conversion…"

17.    As §1.2(a) of the Note dictates: "The conversion price hereunder (the "Conversion

Price") per share shall equal the lower of: (i) the lowest closing price during the preceding ten (10)

Trading Day period ending on the latest complete Trading Day prior to the Issue Date of this Note

(the "Closing Price") or (ii) 61% of the average of the two (2) lowest closing bid prices for the

Common Stock on the Principal Market during the ten (10) consecutive Trading Days on which at

least 100 shares of Common Stock were traded including and immediately preceding the

Conversion Date. If an Event of Default under Section 3.9 of the Note has occurred, Holder, in its

sole discretion, may elect to use a Conversion Price equal to the lower of: (i) the closing price of

the Common Stock on the Principal Market on the Trading Day immediately preceding the Issue

Date or (ii) 61% of either the lowest traded price or the closing bid price, whichever is lower for

the Common Stock on the Principal Market during any Trading Day in which the Event of Default has not been cured."

18.    Further, under §1.4(d) of the Note: "Upon receipt by the Borrower from the Holder of a facsimile transmission or e-mail (or other reasonable means of communication) of a Notice of Conversion meeting the requirements for conversion as provided in this Section 1.4, the Borrower shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for the Common Stock issuable upon such conversion within three (3) business days after such receipt (the "Deadline")."

19.    In order to ensure that sufficient shares are available for conversion, §1.3 of the Note provides that:

> The Borrower covenants that the Borrower will at all times while this Note is outstanding reserve from its authorized and unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of Common Stock upon the full conversion or adjustment of this Note. The Borrower is required at all times to have authorized and reserved seven (7) times the number of shares that is actually issuable upon full conversion or adjustment of this Note (based on the Conversion Price of the Notes in effect from time to time)(the "Reserved Amount"). Initially, the Company will instruct the Transfer Agent to reserve 390,000 shares of common stock in the name of the Holder for issuance upon conversion hereof.

20.    In order to ensure that EMA at all times has shares reserved in connection with the outstanding Note, §5 of the SPA states that:

> In the event that the Company proposes to replace its transfer agent, the Company shall provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to this Agreement and the Securities (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount (as defined in the Note)) signed by the successor transfer agent (to the Company) and the Company.

21.     The SPA requires that the Company must maintain its listing on the OTC Markets and remain current in its reporting obligations. Under §4(e) of the SPA the Company must: "comply in all respects with the Company's reporting, filing and other obligations."

22.     Section 3.20 the Note provides that:

> Unavailability of Rule 144. If, at any time on or after the date which is six (6) months after the Issue Date, the Holder is unable to (i) obtain a standard "144 legal opinion letter" from an attorney reasonably acceptable to the Holder, the Holder's brokerage firm (and respective clearing firm), and the Borrower's transfer agent in order to facilitate the Holder's conversion of any portion of the Note into free trading shares of the Borrower's Common Stock pursuant to Rule 144, and/or (ii) thereupon deposit such shares into the Holder's brokerage account.

## PHBI BREACHES THE AGREEMENTS

23.     Among other things, PBI, is in default of Section 3.20 and related provisions of the Transaction Documents, in that PBI was not Rule 144 eligible six (6) months after the Issue Date.

24.     On or about June 24, 2020, EMA submitted a Notice of Conversion in accordance with the terms of the Transaction Documents.

25.     The June 24, 2020 Notice of Conversion sought to convert $4340.00 in principal under the Note (or $3,340.00 after deductible fees) into 350,000 shares of Defendant.

26.     Defendant failed to honor the June 24, 2020 Notice of Conversion in violation of the terms of the agreements.  Worse still, Defendant actively interfered with EMA's conversion rights by directing an attorney to submit a bogus letter objecting to the conversion.

27.     On or about July 9, 2020, EMA submitted a Notice of Conversion in accordance with the terms of the Transaction Documents.

28.     The July 9, 2020 Notice of Conversion sought to covert $175,530.98 in principal under the Note (or $174,530.98 after deductible fees) into 14,627,582 shares of Defendant.

29.     Defendant once again failed to honor the July 9, 2020 notice of conversion, in violation of the terms of the agreements.

30.     As a result, EMA sent PHBI a default notice.

31.     Accordingly, EMA is entitled to enforce each of its rights under the Note and SPA.

32.      Section 3.2 of the Note provides for a breach in the event that:

The Borrower fails to issue shares of Common Stock to the Holder  (or announces or threatens in writing that it will not honor its obligation to do so  at any time following the execution hereof or)  upon exercise  by the Holder of the conversion rights  of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by  this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove  (or directs  its transfer  agent  not to  remove or impairs, delays, and/or hinders its transfer  agent  from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and  when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure  shall   continue uncured (or any written announcement,   statement or threat  not to honor its obligations  shall  not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice of Conversion…

33.      Likewise, Section 5 of the SPA provides that

Upon receipt of a  duly  executed  Notice  of Conversion, the Company shall issue irrevocable instructions to its transfer agent to  issue certificates, registered  in the name of the  Purchaser  or  its nominee, for the  Conversion  Shares in such amounts as specified from time to time by the Purchaser to  the  Company  upon conversion of the Note, or any part thereof,  in accordance  with  the  terms thereof (the "Irrevocable Transfer Agent  Instructions"). In the  event  that the Company proposes  to replace its transfer agent, the Company shall provide, prior  to the

effective date of such replacement, a fully executed irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to this Agreement and the Securities (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount (as defined in the Note)) signed by the successor transfer agent to Company and the Company.

34.     Section 3.3 of the provides for a breach where "The Borrower breaches any material covenant or other material term or condition contained in this Note and any collateral documents including but not limited to the Purchase Agreement and such breach continues for a period of three (3) days after written notice thereof to the Borrower from the Holder."

35.     Section 3.4 of the Note provides for a breach where: "Any representation or warranty of the Borrower made herein or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith (including, without limitation, the Purchase Agreement), shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement."

36.     Section 3 of the Note provides for the consequence of an event of default, as do certain provisions of the SPA, including the amounts due, default interest, and the liquidated damages that are due in the event of a default.

37.     Section 3.3 and 3.4 of the Note further provide for an event of default for each breach of a covenant, representation, or warranty made by PHBI in connection with the Agreements.

38.     Based on the foregoing events, PHBI's failure to honor EMA's Notices of Conversion and other actions and omissions has given rise to one or more "Event of Default" pursuant to the terms the Note. In addition thereto, PHBI's conduct has caused multiple "Events of Default" to occur.

39.     Section 8 of the Note outlines the negotiated-for and agreed-upon remedies for the differing Events of Default.  Among other things, EMA is permitted to enforce any and all of plaintiff's rights under the Note and SPA, or otherwise as permitted by law.

40.      Page 1 of the Note provides that: "Any amount of principal or interest on this Note which is not paid when due shall bear interest at the rate of twenty-four (24%) per annum from the due date thereof until the same is paid ("Default Interest")."

41.     Due to PHBI's persistent and willful failure to remedy its various breaches, as of filing the instant action, default interest has been accruing at a rate of 24%.

42.      Section 3.16 of the Note provides that, in the event of default, "all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity."

43.     EMA has been, and continues to be, irreparably harmed by PHBI's failure to honor the Notices of Conversion and failure to become Rule 144 eligible within 6 months of the issue date.

44.     Damages from PHBI's failure to deliver the shares are inherently uncertain and difficult to calculate. Since the parties entered in the Note, PHBI's Stock price has fluctuated widely.

45.     Thus, the timing of conversions and sale of stock would be essential to the determination of damages.  Because it is difficult to discern precisely when EMA would have sold the converted shares, and how many it would sell had the conversion been honored, calculating its losses is difficult.

46.     All notices and prerequisites to bringing this action, if any, including notices of default, have been complied with or were waived.

## FIRST CLAIM FOR RELIEF
## (SPECIFIC PERFORMANCE)

47.     EMA realleges and incorporates by reference each and every allegation contained in all preceding paragraphs of this Complaint as if fully set forth herein.

48.     The agreements between plaintiff and defendant are valid agreements.

49.     EMA substantially performed all portions of the agreements that were EMA's obligation to perform, except for those obligations for which performance was rendered impossible by virtue of defendant's breach.   Among other things, EMA's primary obligation under the various agreements was to fund the purchase of the Note in accordance with the terms of the various agreements, which EMA performed.

50.     Pursuant to the Note, SPA, and related agreements, PHBI is obligated to deliver shares of PHBI Common Stock pursuant to the agreement's payment schedule, as well as to provide the transfer agent the necessary board resolutions sufficient to enable EMA to sell the shares publicly without restriction.

51.      Despite its obligation to do so, PHBI has refused and failed to deliver said shares of stock to EMA.

52.     EMA has no adequate remedy at law.

53.     In the absence of injunctive relief and specific performance, EMA will suffer irreparable harm.

54.     EMA requests, therefore, that the Court enter an order requiring PHBI to specifically perform the relevant agreements, including the SPA, Note, and letter to transfer agent,

and to deliver immediately to EMA the shares of its Common Stock pursuant to each notice and Notice of Conversion  submitted, and to maintain the share reserve, as well as to provide EMA with the necessary resolutions, become current in its required SEC filings, and to take whatever steps necessary (as per the terms of the agreement), sufficient to enable EMA to sell the shares publicly without restriction.

## SECOND CLAIM FOR RELIEF
## (<u>BREACH OF CONTRACT</u>)

55.     EMA realleges and incorporates by reference each and every allegation contained in all preceding paragraphs of this Complaint as if fully set forth herein.

56.     The Note and SPA, letter to TA, and related agreements, are valid and binding agreements.

57.      As set forth more fully above, PHBI breached the agreements. PHBI's numerous breaches of the agreement include, but are not limited to:

(i)      failing to honor EMA's notices of conversion; and

(ii)      failing to become "Rule 144 eligible" within 6 months of the issue date. Accordingly, plaintiff seeks the relief set forth herein.

58.     PHBI's conduct constitutes a breach of, and default under, the terms of the Note, SPA and related agreements.

59.     EMA has performed all obligations of the relevant agreements that were its obligation to perform except for those obligations that it could not perform because of defendant's breaches herein.

60.     PHBI's breach and default are governed by Nevada law under the terms of the Note.

61.     EMA is therefore entitled to an award of damages in an amount to be determined at trial but in any event in excess of principal in the sum $180,000.00, including without limitation the balance of any portion of the Note that ultimately is not converted into shares, along with default interest, liquidated damages, and damages as provided for in the Note and by law.

### THIRD CLAIM FOR RELIEF
### (<u>PERMANENT INJUNCTION</u>)

62.     EMA realleges and incorporates by reference each and every allegation contained in each preceding paragraph of this Complaint as if fully set forth herein.

63.     §4.10 of the Note provides:

Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

64.     Pursuant to its obligations under the relevant agreements, PHBI is obligated to deliver shares of its Common Stock, along with the necessary resolutions and acceptance of the legal opinions furnished by EMA, sufficient to enable EMA to sell the shares publicly without restriction.

65.     Despite its obligation to do so, PHBI has failed and refused to deliver said shares of stock to EMA as required by each of the Notice of Conversion and under the various agreements.

66.     As a result of such refusal by PHBI, EMA has suffered damages.

67.     EMA has no adequate remedy at law.

68.      In the absence of injunctive relief, EMA will suffer irreparable harm.

69.     Additionally, PHBI consented to an injunction when entering into the Note and SPA.

70.      EMA requests, therefore, that the Court enter an order enjoining and requiring PHBI to deliver the shares of stock as called for in the relevant agreements in response to the Notice of Conversion, including any future notice of conversion, and requests for shares that were or will be sent, to increase and maintain its shares reserve, and to honor future conversion notices.

**FOURTH CLAIM FOR RELIEF**
**(<u>COSTS, EXPENSES & ATTORNEYS FEES</u>)**

71.     EMA realleges and incorporates by reference each and every allegation contained in each preceding paragraph of this Complaint as if fully set forth herein.

72.     In accordance with the agreements between the parties, PHBI agreed to pay all costs and expenses, including reasonable attorneys' fees and expenses, incurred by EMA in collecting any amount under the Note or breach of the Agreements.

73.     Section 4.5 of the Note states, "If default is made in the payment of this Note, the Borrower shall pay the Holder hereof costs of collection, including reasonable attorneys' fees."

74.     Therefore, EMA is entitled to an award against PHBI for costs and expenses incurred in the prosecution of this lawsuit, including reasonable legal fees.

**<u>CLAIM FOR RELIEF</u>**

**WHEREFORE**, Plaintiff EMA seeks judgment against Defendants as follows:

i.     On the First Claim for Relief, EMA requests that the Court enter an Order requiring Defendant to specifically perform the relevant agreements, including the SPA, Note, and letter to transfer agent, and to deliver immediately to shares of its Common Stock pursuant to each Notice of Conversion, and share requests, file the necessary filings in order to become current in their

required SEC filings, and provide the necessary resolutions and acceptance of the legal opinions furnished by EMA, sufficient to enable EMA to sell the shares publicly without restriction, and to increase and maintain its shares reserve.

     ii.     On all Second Claim for Relief, for damages in an amount to be determined, but in any event in excess of One Hundred and Eighty Thousand Dollars ($180,000.00); and

     iii.     On the Third Claim for Relief, the issuance of an injunction enjoining and requiring Defendant to deliver the shares of stock as called for in the relevant agreements in response to the Notice of Conversion that was sent and to increase and maintain its share reserves and to honor future conversion notices; and

     iv.     On the Fourth Claim for Relief for an award of EMA's costs and expenses in prosecuting this action, including reasonable legal fees; and

     v.     On all Claims for Relief, for interest, attorneys' fees and the costs and disbursements of this action; and

     vi.     For such other further relief as the Court may deem just, proper, and in the interest of justice.

Dated: July 22, 2020
     New York, New York

           LAW OFFICE OF JEFFREY FLEISCHMANN PC
               By: /s/Jeffrey Fleischmann
               Jeffrey Fleischmann, Esq.

           *Attorneys for Plaintiff EMA Financial, LLC*

           150 Broadway, Suite 900
           New York, N.Y. 10038
           Tel. (646) 657-9623
           Fax (646) 351-0694
           jf@lawjf.com